William H. TAYLOR, Plaintiff-Appellee,

v.

AMALGAMATED MEAT CUTTERS AND BUTCHER WORKMEN OF NORTH AMERICA LOCAL UNION 452, AFL–CIO, Defendant-Appellant.

Court of Appeals of Tennessee, Western Section, at Jackson.

Jan. 2, 1981.

Application for Permission to Appeal Denied by Supreme Court June 1, 1981.

Robert L. Taylor, Memphis, for defendant-appellant.

Leo Bearman, Jr., Larry E. Killebrew, Memphis, for plaintiff-appellee.

NEARN, Judge.

William H. Taylor filed suit in the Chancery Court of Shelby County against O. T. Sykes d/b/a Sykes Big Star, Local Union 452, AFL–CIO of the Amalgamated Meat Cutters and Butcher Workmen of North America, and the Retail Food Employers Health and Welfare Trust Fund, for benefits due him as a result of the hospitalization of his wife. The Chancellor rendered judgment in favor of Taylor against Local Union 452 for the benefits sought, in the amount of $8,441.00, and awarded the Local Union judgment against O. T. Sykes d/b/a Sykes Big Star in the amount of $926.00 representing contributions or "premiums" that would have been due the Retail Food Employers Health and Welfare Trust Fund from Sykes. The Chancellor dismissed the claim against the Retail Food Employers Health and Welfare Trust Fund.

This appeal is brought only by the Local Union. It should be noted that although the union never sought a judgment against Sykes, the Chancellor awarded the $926.00 aforesaid in favor of the union. However, Sykes does not appeal this adverse judgment against him. Accordingly, we will let it stand. It is the existence of a judgment, rendered against the union in favor of Taylor, not the amount of such judgment, that is at issue in this case.

We believe that a proper understanding of the issue on appeal requires that we first

set forth the relationship between the parties.

Plaintiff William H. Taylor has been a member of the meatcutters union for more than 20 years. At the time of the controversy herein discussed, and at all times since, plaintiff has been a member in good standing of Local Union 452, AFL–CIO of the Amalgamated Meat Cutters and Butcher Workmen of North America. Separate from the union there exists the entity known as the Retail Food Employers Health and Welfare Trust Fund. The main function of the Health and Welfare Trust is to procure and administer a plan for providing medical and/or hospital benefits for the union members and their dependents. The Trustees of the Trust Fund are empowered to obtain outside group insurance for the benefit of the working union members, or, allow the Trust itself to provide benefits for them. The benefit program of the Trust Fund is to be funded primarily by contributions made by the employers of the union members, pursuant to the terms of a negotiated collective bargaining contract made between the union, representing its membership, and the employers of the union workers.

Pursuant to a call made to the union hall from Sykes Big Star, a grocery store, plaintiff began working for Sykes Big Star on September 23, 1975, where he remained at all times pertinent to this matter.

Sykes had purchased the grocery from Phil Artz who had a contract with the union which was to expire on October 30, 1976. Sykes assumed the obligations of this contract; one of which was to pay a set monthly amount of contribution to the Trust Fund for the benefit of Taylor.

After October 30, 1976, under circumstances to be more fully set out, Sykes failed to pay the contribution to the Trust Fund and did not execute a new contract with the union. On July 11, 1977, Taylor notified his employer and the union that his wife had cancer from which she later died. The claim for the treatment of Taylor's wife was denied by the Trust Fund for the reason that at the time of the claim and since October 30, 1976, Sykes had had no contract with the union and coverage by the Trust Fund was only afforded those who were working under a union contract.

It is the position of the appellant union that employer Sykes, by his failure to remit to the union the monthly contributions to the Welfare Trust Fund caused the benefit provisions of the hospitalization plan afforded thereby to lapse. Further, it is argued that the collective bargaining contract for the payment of the contributions was between the employer Sykes and the union, and that the Chancellor erred in holding the union liable for damages that had resulted because of the breach by Sykes of the collective bargaining agreement. In addition, it is insisted that under the terms of the Welfare Trust a collective bargaining contract must exist before coverage is afforded any one, and no such contract existed in this case at the time of the loss.

Appellee Taylor's position is that both Sykes and the union led him to believe that contributions were being made to the Health and Welfare Fund on his behalf, and that he was not notified by anyone that the contributions were in fact not being made. It was not until after he learned his wife was suffering from cancer and required hospitalization that he was advised of an alleged lack of coverage. Accordingly, it is insisted that the Chancellor did not err in awarding judgment against the union for the benefits plaintiff would have received had the contributions been made.

We believe the Chancellor did err in awarding judgment against the union under the circumstances of the case. However, we further conclude that the error was not in the award of a judgment, but the error lies in the party against which it was directed. Since this is an appeal from a non-jury judgment, when we are satisfied that the preponderance of the evidence or the law requires a different judgment than the one rendered in the Trial Court, it is our duty to render the judgment as we believe it should have been rendered below. TCA § 27–3–103, Rule 13(d), Tennessee Rules of Appellate Procedure; *Joest v. John A. De-*

*nie's Sons Co.* (1939) 174 Tenn. 410, 126 S.W.2d 312.

As revealed by the transcript of the proceedings the principal witnesses to this controversy are John E. Lambert, Mike A. Mancini, O. T. Sykes, Marye Sykes Bandy and plaintiff Taylor. It appears that the active officers and principal spokesmen for the union are John E. Lambert and Mike A. Mancini. Lambert also serves as one of the Trustees of the Health and Welfare Trust Fund.

Defendant O. T. Sykes, a dentist by profession, purchased the Big Star grocery store at which plaintiff Taylor was employed. The day to day management of the store was relegated to Sykes' sister, Marye Sykes Bandy.

Plaintiff had been a member of the Meat Cutters Union in Chicago, Illinois, prior to 1974. In that year plaintiff moved to Memphis and affiliated with the local union. The proof shows that plaintiff has always been concerned with his hospitalization coverage. When he transferred to the defendant union, he inquired and was informed that he would be covered by the same type of Health and Welfare coverage that he enjoyed in Chicago.

Shortly after becoming employed by Sykes Big Star, it became obvious to plaintiff that the Sykes Big Star was suffering from management difficulties as well as a shortage of operating capital. Additionally, both the union and the Health and Welfare Fund were aware of Sykes' financial problems because Taylor had made known to the union that Sykes appeared to be having financial difficulties, and because some of the monthly contribution checks Sykes was obligated to send to the Health and Welfare Trust Fund were either late in arriving, or "bounced", or both. Without further belaboring the matter we think it safe to say that everyone concerned knew that Sykes Big Star had a cash flow problem. However, all checks due to be paid prior to October 30, 1976, the expiration date of the collective bargaining contract, were made good, and no funds are owed by Sykes which represent contributions due prior to October 30, 1976.

The collective bargaining agreement under which Sykes Big Star and other local groceries were operating with the union, had its inception in 1974. The agreement provided that it "shall terminate on October 30, 1976, and shall remain in effect from year to year thereafter, unless either party shall give the other party notice, no later than sixty (60) days prior to the expiration date of a desire to terminate or change the terms thereof". Acting in behalf of its membership, the union sent proper sixty (60) day notice to all store owners, including Sykes, that the union desired "to terminate or change the terms thereof." Shortly thereafter, negotiations were had between a committee of store owners and the union. Sykes testified that he did not attend any of the negotiation meetings. Shortly before a strike deadline of October 30, 1976, an agreement was reached, and a new collective bargaining contract was to be prepared and signed by all parties. Among the provisions of the new agreement was an increase in hourly wages to union employees. The parties to the contract were aware that the mechanics of drafting the new contract would take some time. However, it appears that during the interim between the October agreement and the formal drafting of the contract, the affected employers paid the new higher wage and continued to remit the Health and Welfare contributions. That is to say, all of the employers except Sykes made their payments. It seems that while Sykes paid the new higher wage scale to union employees, he failed to send the monthly contributions in a valid form. In the meantime, the union was attempting to get the new contract signed by all employers. All signed except Sykes. The union representative, Mancini, made several trips to the store to get Dr. Sykes to sign the contract. He was unable to contact Sykes at the store, but indicated that he would go to the dental office to obtain Sykes' signature. Dr. Sykes testified that he was never contacted by the union representative, Mancini, nor was he aware of the necessity of actually signing the new contract.

Lambert testified that in December, 1976, he also sent Mancini to Sykes Big Star to inform Taylor that he was no longer covered under the Health and Welfare program because no new contract had been signed. However, there is considerable dispute as to the exact conversation and information delivered by Mancini to Taylor.

In late December, 1976, evidently in an attempt to pay the November contributions, Sykes sent a check to the union with instructions that it not be cashed until January 14, 1977. This check was ultimately returned by the bank due to insufficient funds.

We concur with the Chancellor's finding that no one has attempted to perpetrate a fraud, and that the witnesses did their best to tell the truth as they recall it. We further concur that if, in fact, Mancini did attempt to advise Taylor that he was no longer covered under the Health and Welfare plan, it was not done in clear, unmistakable terms. The fact that Mancini was simultaneously attempting to obtain Sykes' signature on the new contract enhances the misunderstanding.

In June of 1977, Dr. Sykes agreed to do some dental work for Taylor. Prior to having this work done, Taylor checked with Marye Sykes Bandy to verify his Health and Welfare coverage. The record indicates that Marye Sykes Bandy called Dr. Sykes' secretary to verify that the Health and Welfare Fund contributions were paid up. Based on this verification Dr. Sykes performed the dental work and Taylor submitted a claim to the Health and Welfare Fund for payment.

On July 11, 1977, Taylor informed Marye Sykes Bandy and Mancini that his wife had cancer. Then, in a letter dated July 12, 1977, Taylor was notified that the dental claim would not be paid, and that he was not covered under the Health and Welfare Fund because Sykes Big Star had been dropped from the union for failing to sign the contract.[1] Taylor maintained that this

was the first he knew of the fact that Sykes Big Star was not under the union contract and that the contributions had not been paid. Taylor then went to Marye Sykes Bandy about the situation and she forwarded a Sykes Big Star check for the past due contribution owed to the Health and Welfare Fund for Taylor's account. The check was refused because Dr. Sykes has never signed the new contract and under the terms of the Trust Fund agreement, payments to the Fund could not be made by employers not participating in the collective bargaining agreement. During this entire time, Sykes Big Star displayed a sign in the meat department that it was a union shop. Several months after its attempt to pay the contributions for Taylor's account, on November 10, 1977, Sykes Big Star went out of business.

From a reading of the Chancellor's oral opinion found in the transcript, it appears that he was of the opinion that the Health and Welfare Trust Fund could not be liable because there was no contract in existence between the union and Big Star, and their liability was predicated upon the existence of such a contract. The Chancellor stated he was dismissing the action against the Health and Welfare Fund because "they were not an active party to this at all." That is, they were not involved in the actions resulting in this case. We respectfully disagree with the Chancellor's reasoning. We are of the opinion that the Health and Welfare Fund should have been active and participating, and their failure to be involved is exactly what renders them liable.

Section 1.3 of the Health and Welfare Agreement defines contributions as "the payments required to be made to this Trust by an Employer under a Collective Bargaining Agreement *and payment made by an Employee on behalf of himself under the conditions and for the time period to be specified by the Trustees hereunder.*" (Emphasis added.) Throughout the agreement the trustees are referred to as "fiduciaries".

---

1. The dental claim is not a matter for our consideration on appeal. It's only materiality is to show that by its rejection Taylor became aware of the position of the Health and Welfare Fund—that he had no coverage.

They are fiduciaries for the adoption and administration of a Health and Welfare Plan for the Employees and their dependents. Section 5.13 of the agreement provides

"Notwithstanding any other provision of this Trust Agreement to the contrary, the Trustees shall discharge their duties *solely in the interest of the participants and beneficiaries for the exclusive purpose of providing benefits to the participants and their beneficiaries* and defraying reasonable expenses of administering the plan, with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." (Emphasis added.)

In short, the relationship existing between the union member and the Trustee is not the same business relationship as exists between an insuror and an insured, but is on a higher plane as that of Trustee and beneficiary. A great deal more is required of a Trustee in dealing with a beneficiary than of opposite numbers in an arms length business transaction. One of the most fundamental duties of the Trustee is that he must display throughout the administration of the Trust complete loyalty to the interests of the beneficiary. *Bogert on Trusts and Trustees*, 2nd Ed. § 543.

There can be no doubt from the proof that as of December 1976, Lambert, as Trustee for the Health and Welfare Trust Fund, knew that Sykes had not paid the required contributions since October 30, 1976, and that Taylor was in imminent danger of losing his benefits. Lambert further testified that he advised Mancini to relay that information to Taylor in December of 1976. We hold that there was a legal duty upon the Health and Welfare Trust Fund because of the fiduciary relationship between the parties to advise Taylor of that fact. This being true, the burden is upon the Trustee to show that the duty was met. We find that the Health and Welfare Trust has failed to carry the burden of that proof.

In addition, we hold that the duty was upon the Health and Welfare Trust to advise Taylor that he had the right under the agreement to pay the monthly contribution himself and protect his interest in the Trust Fund. There is no proof that any attempt was made to advise Taylor of that right. As we have previously noted, we find as did the Chancellor, that all acts of Lambert as Trustee were done in good faith. Lambert candidly testified that until such was called to his attention at trial, he was unaware of Taylor's option to himself, pay the contributions. We are aware that for the most part the Trustees are not trained in legal matters and are attempting to do their best to administer their trust. Nevertheless, they are fiduciaries and subject to the laws governing same.

Of course, there is no duty even on a fiduciary to advise the beneficiary of that which the beneficiary already knows. However, we find as did the Chancellor that the evidence does not satisfactorily show that Taylor was aware of the fact that Sykes had failed to make the required contributions and that Taylor's benefits had ceased. Taylor was not primarily obligated to pay the monthly contributions. According to the contract, such payment was the duty of Sykes. Sykes led Taylor to believe that the contributions had been paid and that Big Star was operating under a union contract. The only way that Taylor would positively know that they were unpaid was to be informed of such fact either by Sykes or the Trustees. The proof does not satisfactorily show Taylor was informed by either of these sources. Taylor was being paid the new higher wage under the new collective bargaining contract even though Sykes had not signed same. This could reasonably lead him to believe that he was being paid under the new contract. In addition, Sykes kept a sign posted stating that he was operating a union shop. From these facts we cannot find that Taylor possessed a knowledge of the true state of affairs either as to the nonpayment of the contributions or the lack of a contract between Sykes and the Health and Welfare Fund. However, we do not believe Taylor's lack of

knowledge of the existence of a valid contract between the union and Sykes is a matter of great importance or is a fact by which liability could be placed on the union in this case. Appellants insist that the existence of a contract between Sykes and the union is a prerequisite for Taylor's recovery under the general terms of the Health and Welfare Fund agreement. However, other provisions of the Health and Welfare Fund agreement afford the worker the right to make contributions himself. That right can come into play only when the employer does not pay. Therefore, the right exists only on the breach of the contract by the employer or its lapse. Had Taylor possessed knowledge that no contract existed after October 30, 1976, the duty was still upon the Trustee to notify Taylor that no contributions were being made during the negotiation period, and to advise Taylor of the right under Health and Welfare provisions to pay the contributions himself. It seems to us that the very purpose of the provision is to allow a worker to himself make the contributions when no contract in fact exists. Such occasion might arise in case of a strike. The worker would certainly be aware of the lack of a contract in that situation, but he would not necessarily be aware of his right to himself pay the contributions unless so advised by the Trustee.

As we have indicated, the duty was on the Health and Welfare Trust Fund, not on the union, to advise Taylor of his status in order that he could protect himself. In that duty the Health and Welfare Trust failed, and is obligated to Taylor for the judgment amount.

The result is that the judgment against Local 452 of the Amalgamated Meat Cutters and Butcher Workmen of North America, in the amount of $8,441.00 is reversed. Judgment in the amount of $8,441.00 against the Retail Food Employers Health and Welfare Trust Fund will be entered in this Court and the cause remanded to the Chancery Court for execution, if necessary, of the judgment. The judgment against O. T. Sykes d/b/a Sykes Big Star will remain undisturbed. Costs of appeal are adjudged against Retail Food Employers Health and Welfare Trust Fund.

Done at Jackson in the two hundred and fifth year of our Independence and in the one hundred and eighty-fifth year of our Statehood.

MATHERNE and SUMMERS, JJ., concur.